In re Interest of Jordana H. et al.,
children under 18 years of age.
State of Nebraska, appellee, v. Carlos H.,
appellant, and Jennifer H., appellee.

___ N.W.2d ___

Filed May 27, 2014.    Nos. A-12-1067 through A-12-1070.

1. **Parental Rights: Pleadings.** Under Neb. Rev. Stat. § 43-291 (Reissue 2008), facts may be set forth in an original petition, a supplemental petition, or a motion filed with the court alleging that grounds exist for the termination of parental rights.

2. **Juvenile Courts: Jurisdiction: Parental Rights.** The juvenile court shall have jurisdiction of the proceedings for termination of parental rights.

3. ____: ____: ____. The juvenile court properly acquires jurisdiction over an original action to terminate parental rights as provided in the Nebraska Juvenile Code without prior juvenile court action, including adjudication.

4. **Juvenile Courts: Jurisdiction: Parental Rights: Pleadings.** The juvenile court acquires jurisdiction to terminate parental rights when a motion to terminate containing the grounds for termination is filed, without prior juvenile court action, including adjudication.

5. **Juvenile Courts: Parental Rights: Pleadings.** The grounds contained in Neb. Rev. Stat. § 43-292(1) through (5) (Cum. Supp. 2012) do not require, imply, or contemplate juvenile court involvement, including adjudication, prior to the filing of the petition for termination of parental rights.

6. **Due Process: Juvenile Courts: Parental Rights.** When a juvenile court proceeds with a hearing on a termination of parental rights without a prior adjudication, the proceedings must be accompanied by due process safeguards.

7. **Juvenile Courts: Jurisdiction: Parental Rights.** A juvenile court has exclusive original jurisdiction as to a proceeding for termination of parental rights.

8. **Rules of Evidence: Parental Rights.** The Nebraska Rules of Evidence apply in adjudication proceedings but not in proceedings for termination of parental rights.

9. **Juvenile Courts: Expert Witnesses: Pretrial Procedure: Pleadings.** In an adjudication hearing, an opponent of expert testimony is required to file a concise pretrial motion to challenge the expert's testimony on the basis of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

10. **Parental Rights: Rules of Evidence: Expert Witnesses.** In a termination of parental rights hearing, where the rules of evidence do not apply, neither do the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

11. **Due Process: Parental Rights: Proof.** In termination of parental rights cases, due process controls and requires that fundamentally fair procedures be used by

the State in an attempt to prove that a parent's rights to his or her child should be terminated.

12. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.

13. ____: ____. A finding of abuse or neglect may be supported where the record shows (1) that a parent had control over the child during the period when the abuse or neglect occurred and (2) that multiple injuries or other serious impairment of health have occurred which ordinarily would not occur in the absence of abuse or neglect.

14. **Parental Rights: Circumstantial Evidence: Proof.** Circumstantial evidence may be used in a disposition proceeding in which the burden of proof is "clear and convincing."

15. **Circumstantial Evidence: Proof.** A fact proved by circumstantial evidence is nonetheless a proven fact.

16. **Circumstantial Evidence.** Circumstantial evidence is not inherently less probative than direct evidence.

17. **Parental Rights: Circumstantial Evidence: Proof.** In many cases of child neglect or child abuse, the only proof available is circumstantial evidence.

18. **Parental Rights.** Parental rights can be terminated only when the court finds that termination is in the child's best interests.

19. ____. Statutory grounds for termination of parental rights as contained in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) are based on a parent's past conduct, but the best interests element focuses on the future well-being of the child.

20. ____. A court may not simply assume that the existence of a statutory ground for termination of parental rights necessarily means that termination would be in the best interests of the child.

21. **Parental Rights: Right to Counsel.** A parent in a juvenile court case has the right to appointed counsel if unable to hire a lawyer.

22. **Appeal and Error.** It is not the duty of a reviewing court to search the record for the purpose of ascertaining whether there is error, and any error must be specifically pointed out.

Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

David S. MacDonald, Deputy Scotts Bluff County Public Defender, for appellant.

Tiffany Wasserburger, Deputy Scotts Bluff County Attorney, for appellee State of Nebraska.

Jeremy C. Jorgenson for appellee Jennifer H.

Audrey M. Elliott, of Kovarik, Ellison & Mathis, P.C., guardian ad litem.

Inbody, Chief Judge, and Pirtle and Riedmann, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Carlos H. appeals from the order of the county court for Scotts Bluff County, sitting as a juvenile court, terminating his parental rights to his four minor children. The cases have been consolidated for consideration on appeal. We note that the children's mother, Jennifer H., also filed a notice of appeal, but failed to file a brief. Thus, we grant her no affirmative relief. We find no merit to Carlos' assignments of error and therefore affirm the decision of the juvenile court.

## II. BACKGROUND

Carlos and his wife, Jennifer, are the parents of three daughters: Skylar H., born in October 2004; Taylor H., born in February 2009; and Jordana H., born in December 2011. They also have one son, Ashton H., born in November 2005. When the juvenile court terminated Carlos' parental rights to the minor children, it also terminated Jennifer's parental rights. Jennifer filed a notice of appeal after Carlos perfected his appeal, and thus, pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2010), Jennifer is considered an appellee. In order to seek affirmative relief, Jennifer was required to file an appellee's brief containing a cross-appeal, but she failed to file a brief. Therefore, we cannot grant her any affirmative relief, and we will limit our discussion of her involvement to information necessary to address Carlos' arguments.

### 1. Events Leading to
### Removal in 2011

In October 2011, the Nebraska Department of Health and Human Services (DHHS) received several telephone calls regarding Ashton's welfare. The caller expressed concerns about Ashton's small size, multiple bruises on his body, obsession with food, and absences from school. Based on the telephone calls, Nichole Kihlthau, a child and family services specialist with DHHS, attempted to locate Ashton to do a welfare check. She contacted Ashton's school on October 10 and learned that Carlos had informed the school that Ashton

was home sick because he had had an allergic reaction to a flu shot.

On October 12, 2011, Kihlthau learned that Ashton had never received a flu shot. Because Ashton had not yet returned to school, Kihlthau and a Scottsbluff police officer went to Carlos and Jennifer's house around 11 a.m. to look for him. Jennifer told them Ashton had gone on a trip with Carlos and would return in a few days. After checking on Taylor, who was asleep upstairs in the home, Kihlthau and the officer left. They went back to Carlos and Jennifer's home around 3 or 4 p.m. to gather more information about Ashton's whereabouts from Jennifer. They then left the home again and returned a third time, that evening, with two additional police officers.

While the officers searched the home for Ashton, Kihlthau went upstairs to talk to Skylar and Taylor. She observed two bedrooms upstairs at the house. One was Carlos and Jennifer's bedroom. The other bedroom was pink and contained only one bed and solely girls' clothes and toys. Kihlthau asked Skylar and Taylor where Ashton's things were, and they both said "downstairs." Skylar said Ashton's clothes were dirty because the girls were allowed to "spit and poop" on them. Kihlthau did not see any indication that a boy lived in Skylar's bedroom. When Kihlthau went to the basement of the home, she observed a rack and a laundry basket containing boys' clothes.

Finally, around 7:30 or 8 p.m., Jennifer admitted that Ashton had a large scrape across his face and that Carlos had taken him so that it did not look like Carlos and she had abused him. She said Ashton was with Carlos at Carlos' parents' house. Ashton was located there a short while later.

Subsequently, Investigator Joe Rohrer, one of the police officers who was involved in the search for Ashton, received a telephone call from Carlos. Carlos agreed to meet Rohrer at the police station. Carlos initially told Rohrer the same story that Jennifer had told: that he had taken Ashton on a trip. But when confronted with the truth, Carlos admitted that he got scared because Ashton's injuries "looked really bad" and he was afraid DHHS would take his children away. He claimed

that Ashton's injuries were the result of a fall down the stairs into the basement of Carlos and Jennifer's house.

Photographs taken of Ashton that night depict a large red mark on the right side of his face, a bump on his forehead, a black eye, a rash all over his skin, and a distended abdomen. The large mark on Ashton's face and a mark on his shoulder contained a similar, linear pattern. Kihlthau, Rohrer, and a Scottsbluff police captain observed that the imprint on Ashton's face was consistent with a shoe print. Police confiscated several pairs of "flip-flop" sandals from Carlos and Jennifer's house. Subsequent forensic testing concluded that one of the "flip-flops" could have caused the injuries to Ashton's face and shoulder, but the testing did not rule out other potential items as the cause.

Ashton was taken to the hospital the night of October 12, 2011, for examination. The nurse who examined him said that if he had not already been in DHHS' custody when he was brought in, she would have reported his condition because she suspected his injuries were caused by abuse. Her suspicions were raised because of the extent of the bruises and scratches on his body and his overall condition. She also noticed that his size was very small for a 5-year-old, his abdomen was distended, and his arms and legs were very skinny. Skylar, Ashton, and Taylor were removed from Carlos and Jennifer's custody that night and placed in foster care. Jordana had not yet been born, but upon her birth in December 2011, DHHS immediately removed her from Carlos and Jennifer.

## 2. PRIOR CONCERNS OF ABUSE
### AND REMOVAL OF CHILDREN

The 2011 incident was not the first time the children had been removed from Carlos and Jennifer; nor was it the first time Carlos and Jennifer had been suspected of child abuse. In 1998, Carlos pled no contest to felony child abuse from an incident involving the 6-month-old child of his former wife. In December 2004, when Carlos and Jennifer lived in Kansas, 2-month-old Skylar was taken to a hospital by ambulance because she was unconscious and not breathing. Carlos and Jennifer provided conflicting stories about what

happened to her. The physician at the hospital suspected child abuse but could not substantiate it because of a lack of visible injuries.

A year later, in December 2005, Carlos and Jennifer took 2-month-old Ashton to the hospital, where it was discovered that he had a broken femur. He was also found to have older injuries that were in the process of healing, including a fractured rib and fractured elbow. Carlos and Jennifer explained that they had pulled Ashton out of the bathtub, causing his leg injury, but three physicians involved in Ashton's care agreed that the injuries were likely caused by abuse. As a result of Ashton's injuries, Skylar and Ashton were removed from Carlos and Jennifer's care and adjudicated through the Kansas juvenile court. Carlos moved out of the home for several months while he and Jennifer completed services as part of their case plan. Eventually, the children and Carlos were reintegrated into the home, and the case was closed in November 2007. The family moved back to Nebraska shortly thereafter.

In May 2009, Carlos took Ashton to a hospital emergency room with a laceration on the back of his head that required staples. The nurse who examined Ashton also noticed several areas of bruising on Ashton, including large bruises on his back and bruises in various stages of healing all over his body. The extent of the injuries was concerning to the nurse, so she reported it to the hospital's social worker. She was also concerned about Carlos' demeanor, because he was sitting 3 feet away from Ashton while Ashton was holding a dressing on his own head and because Carlos was on his cell phone throughout the entire examination. Carlos told the nurse that one of Ashton's sisters had caused the bruises on Ashton, but Ashton told the social worker that Carlos was the cause. Carlos also said to the nurse, "'I know you're suspecting abuse and you're not going to find anything.'"

Concerns about Ashton's welfare were also reported in January 2010. Scottsbluff police received a report that although Ashton was 4 years old, he could speak only a few words, appeared very skinny for his age, and had bruising on his

back, collarbone, and shoulders. An officer went to Carlos and Jennifer's home and observed bruises on Ashton's back and noted that he looked skinny and sickly with sunken eyes. However, Ashton was allowed to remain in his parents' care at that time.

### 3. Current Juvenile
### Court Proceedings

On October 14, 2011, the State filed petitions alleging that Skylar, Ashton, and Taylor came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). On December 14, the State filed motions to terminate the parental rights of Carlos and Jennifer to Skylar, Ashton, Taylor, and Jordana. Amended petitions were filed on May 8, 2012. The termination hearing was held in August 2012 and took place over the course of 7 days.

### (a) School Personnel's
### Testimony

Several personnel from Ashton's school testified at the hearing. A school social worker testified that she made two reports to DHHS voicing her concerns that Ashton was being abused or neglected. Her concerns were based on numerous marks on Ashton's body, the fact that he was often hungry and seemed preoccupied with food, and his frequent absences from school. In the first 2 months of kindergarten, Ashton missed 10 days of school. Several teachers at the school also testified that Ashton would often miss school and come to school with scratches, bumps, and bruises on his body.

The school personnel also noticed Ashton's fixation with food. One teacher observed that Ashton always seemed hungry and would eat all of his food and ask for more. If he dropped any of it on the floor, he would pick it up and eat it off the floor. Another teacher testified that Ashton had been found going through other students' backpacks looking for food and trying to catch food that other children were dumping in the garbage. Carlos and Jennifer told the school that Ashton had to be on a special, limited diet because he had numerous, severe food allergies. But when the school asked them to sign

a release of information so the school could verify Ashton's allergies with a doctor, they refused.

### (b) Skylar's Testimony

Skylar testified at the termination hearing. She described Carlos and Jennifer as "mean" because they would spank Ashton. She testified that Jennifer spanked Ashton with a belt on the back, arms, legs, and head. She said that he would cry when Jennifer hit him with the belt and that that made Skylar sad. Skylar also testified that she saw Jennifer spank Ashton with a "flip-flop" on his arms, legs, belly, and head and that the large mark on the right side of Ashton's face that was visible when the children were removed from the home was caused by Jennifer's hitting him with a "flip-flop." Skylar said that she also saw Carlos spank Ashton on the back, arms, and legs with a belt and a boot.

Skylar testified that she did not like how Carlos and Jennifer treated her either. According to Skylar, they spanked her with a belt on her back, arms, and legs and it hurt. Skylar said they also used their hands to hit Taylor.

Skylar explained that she slept upstairs in her bedroom and Taylor slept upstairs with Carlos and Jennifer, but that Ashton slept in a dog kennel in the basement. She stated Carlos and Jennifer would put Ashton in the kennel and close the door after he was inside. According to Skylar, no one would stay downstairs with Ashton and no lights were left on for him.

Skylar said that Carlos and Jennifer also denied Ashton food. According to Skylar, she, Taylor, Carlos, and Jennifer sat at a table in the kitchen to eat, but Ashton was at a separate table where he had to stand and eat by himself. Ultimately, Skylar said that she did not feel safe when she was living with Carlos and Jennifer because they were "mean" and that she did not want to go back and live with them.

### (c) Expert Testimony

The court also heard testimony from Dr. Bruce Buehler, a physician board certified in pediatrics, clinical and biochemical genetics, and endocrinology. Dr. Buehler has worked with a genetics clinic, which specializes in working with people

who have special genetic, motoric, or educational needs, for 31 years. He saw Ashton on two occasions in 2010 when Carlos brought him in due to Ashton's short stature and developmental delays. Dr. Buehler noticed that Ashton was very delayed with his motor skills and speech and that he was very shy and withdrawn. He also noticed numerous bruises all over Ashton's body and a calcified area on Ashton's skull, which were not consistent with falling down. At that time, Dr. Buehler suggested to Ashton's pediatrician that Ashton was possibly being abused. He also expressed concern about psychosocial issues and was concerned that the cause of Ashton's delays was situational. Dr. Buehler conducted extensive genetic testing on Ashton to try to determine the cause of his delays, but he was unable to identify any underlying genetic conditions.

When Dr. Buehler saw Ashton again after he had been removed from Carlos and Jennifer's care, he observed that Ashton was "psycho-socially an amazingly different child." Ashton exhibited no autistic behaviors, he was very warm and friendly, he was trying to speak and joke, and he was much more interactive and played with toys. He had also grown approximately 3 inches in height, which was very notable and showed that his growth hormone had "turned on." The next time Dr. Buehler saw him, Ashton had grown several more inches in height and seemed friendlier yet with people.

Dr. Buehler opined to a reasonable degree of medical certainty that Ashton suffered from "psycho-social dwarfism." He explained that psychosocial dwarfism occurs when a child lives in an abusive environment and the environment depresses the growth hormone, causing the child to stop growing. Dr. Buehler's diagnosis was based on the fact that changing Ashton's environment caused Ashton to grow without any added growth hormone. A psychosocial dwarfism diagnosis is reached by ruling out other causes of lack of growth, and Dr. Buehler's conclusion came as an "evolution of [his] testing," because genetically he ruled out all possible conditions for Ashton's lack of growth. Dr. Buehler testified that he did testing as extensive as he knows how to do and that he

had two other doctors look at Ashton, but no one could find another diagnosis.

Dr. Buehler testified that it is in Ashton's best interests to remain in the environment he is currently in because it has caused him to grow and improve and has changed his social ability. Because Ashton is delayed, he is at risk for potential abuse, as are all children who are delayed, and therefore, it is even more important that Ashton's home be safe and stable. According to Dr. Buehler, the cause of psychosocial dwarfism is abuse, but it does not have to be physical abuse; it can be anything that a child perceives as a danger. Factors such as a lack of bonding, a lack of parenting, a fear, or someone in the house who frightens the child have all been shown to decrease the growth hormone.

Ashton's pediatrician, Dr. Cynthia Guerue, also testified. In the past, she had found that Ashton has allergies and eczema and that he appeared developmentally delayed. Based on his delays, she referred him to physical therapy, occupational therapy, and early intervention. She saw him on October 17, 2011, a few days after he had been removed from Carlos and Jennifer's care. She was concerned about his distended abdomen, and testing revealed that his liver enzymes were elevated but decreased quickly, which indicated some sort of trauma to his liver. At that time, she suspected he may have psychosocial dwarfism. She consulted with a child abuse expert, who also suggested looking into psychosocial dwarfism.

When Ashton presented for a followup appointment with Dr. Guerue in June 2012, he had grown significantly and his demeanor was much different. Dr. Guerue testified that Ashton was talkative, interactive, and playful. He had grown 4¾ inches in the previous 7½ months, whereas he had grown only 3½ inches in the previous 4 years when he was living with Carlos and Jennifer. Dr. Guerue also noticed that all of Ashton's eczema was gone, when it "was almost always present" at his previous visits. To a reasonable degree of medical certainty, Dr. Guerue diagnosed Ashton with psychosocial dwarfism based on his improved growth and social change. Dr. Guerue opined that it was important for Ashton's physical well-being

that he be maintained in the environment that caused him to achieve his current growth and progress.

Psychologist Dr. Alan Smith began seeing Ashton in November 2011 and saw him two to four times per month between November and August 2012. At Dr. Smith's first home visit with Ashton, Ashton needed assistance walking up two steps in the foster home; his legs were tremulous, which suggested muscle weakness; and he had an "odd gait." Dr. Smith noted that Ashton was also very small with a distended abdomen, he was obsessed with food and had to have it in his physical possession at all times, and he could not be separated from his foster mother for more than a few seconds. Dr. Smith observed that when Ashton would talk about innocuous topics, he was calm and self-contained, but if Carlos or Jennifer was mentioned, Ashton's breathing became shallow, his muscles became tense, and he "had to sit on [his] foster mother's lap."

During Dr. Smith's second home visit with Ashton, he noticed that Ashton dissociated when talking about his prior homelife, meaning that in addition to the above-mentioned shallow breathing and muscle tension, the amount of time it took him to respond increased considerably and he started talking in a very childlike tone of voice, using simple vocabulary, and talking about irrelevant things. He also looked "spacey," which is an emotional numbing that happens when someone dissociates. When Dr. Smith switched to a more neutral topic of discussion, Ashton's behaviors became more typical.

Two or three weeks later, Dr. Smith went to the foster home for a third visit. At that time, he noticed additional improvement in Ashton's food obsession and separation anxiety. Dr. Smith made a fourth visit to the foster home in January 2012, and at that time, he noticed continued improvement in Ashton's preoccupation with food. Ashton was also running through the house and showed Dr. Smith that he could pull himself into the bathtub and get out by himself. Ashton was also engaging in sustained play with his foster siblings. Ashton had spontaneously mentioned to his foster mother that he had to stay in the basement at home and was hit with a

shoe. But when Dr. Smith asked Ashton about those topics, he saw Ashton moving into a dissociative state and quickly changed the topic.

At Dr. Smith's most recent visit with Ashton, which occurred a week or two prior to the termination hearing, Ashton showed further improvement. He made eye contact, spoke to Dr. Smith's wife, initiated conversation, engaged in imaginative play without needing adult reassurance, and engaged in spontaneous play. He had also grown about 6 inches overall, and his abdomen was more proportionate to his body. In addition, Ashton's gait had improved considerably and he could run, jump, and tumble. His ability to communicate had improved, but he still lagged behind for his age. Dr. Smith testified that there are many things that the school will need to work on with Ashton's language skills and that therefore, it is very important that he have consistent school attendance.

Dr. Smith diagnosed Ashton with posttraumatic stress disorder and intermittent explosive disorder. In children, a diagnosis of posttraumatic stress disorder essentially means the fight-or-flight system is oversensitized to an event where an individual feels at risk for his or her safety or well-being or that of another. A diagnosis of intermittent explosive disorder means that the episodes of emotional disregulation are significant and severe. When asked for his recommendations for Ashton based on these diagnoses, Dr. Smith stated that Ashton needs a "care giver setting" and settings within the school system that re-create the type of environment that he needed when he was very young to develop a healthy, functional, and adaptive emotional system. It appeared to Dr. Smith that Ashton is currently in the setting that he needs. Dr. Smith opined that it would be in Ashton's best interests to remain where he is to allow him to continue to grow and reach a positive sense of security and safety.

Dr. Smith stated that Ashton also needs permanency. In Dr. Smith's opinion, Ashton's history was not indicative of his having had a secure, consistent place; his home was indicative of a neglectful and abusive home environment. Dr. Smith was concerned because even a discussion of having contact with Carlos or Jennifer caused Ashton to dissociate and because

Ashton experienced fear about returning home and did not want to return home. Dr. Smith also noted that Ashton referred to his parents by their names—Carlos and Jennifer—instead of calling them "Dad" and "Mom." Anytime Ashton was exposed to the possibility of testifying in court or having any possible contact with Carlos or Jennifer, with their house, or with anything that reminds him of it, he had "huge explosions." The topics which were the most significant triggers for Ashton were the beliefs that he will have contact with his parents, that he is going to be removed from his foster parents, and that he will be returned home and the discussion of events that bother him that happened in his home, such as those involving the dog kennel and being hit.

Jeanna Townsend is a licensed mental health practitioner and certified professional counselor. She began seeing Skylar and Taylor in November 2011 and saw them a total of 10 to 15 times. Initially, Skylar had a hard time making eye contact, she muttered, and she was very withdrawn and did not initiate conversation. She also had a "strange . . . vocal inflection" when asked about Carlos and Jennifer or her situation at home. Townsend said that the inflection was hard to describe, but that it was almost as though Skylar was swallowing her words and holding herself back from being able to finish her answer. When discussing her parents or homelife, she would also give very short answers, answer very quietly, and give only one- or two-syllable answers. Townsend also stated that when Skylar would discuss stories about Ashton, Skylar exhibited very little empathy, which Townsend said was not a normal sibling relationship, and that children Skylar's age are usually able to express empathy.

More recently, Skylar had stopped her verbal "halting" when discussing her home or parents. She also engaged in conversation more easily, she appeared to have a bond with the people that brought her to sessions with Townsend, and she acted more age appropriately.

Townsend testified that permanency is very important for Skylar because it is a fundamental need for children so they can further develop. In addition, because Skylar may have been exposed to some very negative situations, as she forms her

identity in the next few years, it is going to be very important for her to have a "healthy" female role model.

Townsend has concerns if Skylar were to be returned to Carlos and Jennifer's home. When she first met Skylar, Skylar was "shutting down emotionally" regarding empathy and did not demonstrate feelings of worry or empathy for Ashton, which indicated to Townsend that there might be a lifelong coping issue developing, because children who have been traumatized and do not have any sort of intervention have lifelong issues. However, Townsend has seen improvement in Skylar since Skylar has been in an out-of-home placement, and Skylar's progress has continued in the time that Townsend has seen her.

Taylor was only 2½ years old when Townsend first saw her, so Taylor was "kind of oblivious to everything"; however, when talking about "things at home," especially in the presence of Skylar, Taylor exhibited the same vocal inflection that Skylar did. Townsend believes that permanence is also important for Taylor, because it is such a fundamental need for a child. Townsend expressed concern if Taylor were returned to Carlos and Jennifer's home, because children who are in an abusive environment will identify with either the abused or the abuser.

Townsend also had concerns about Jordana's being in a home that was abusive to one of the other children, for the same reason, but even more so because a baby would be unable to verbalize any issues.

Dr. Suzanne Haney, a board-certified child abuse pediatrician, was contacted to consult and review Ashton's case. After reviewing medical records, school records, law enforcement reports, DHHS reports, and photographs, Dr. Haney had concerns that Ashton was subjected to abuse on at least two separate occasions and that he had significant enough neglect that he had stopped growing. She concluded that the injuries Ashton suffered when he was 2 months old resulted from abuse, because such a young child is not capable of sustaining those injuries on his or her own and there was no appropriate history to account for the injuries. The fact that Ashton had old and new injuries indicated multiple episodes

of injury, which indication is "more concerning for repetitive abuse."

Dr. Haney was also concerned about Ashton's injuries when Ashton was taken into DHHS custody in October 2011, particularly his facial injury, which was consistent with being hit with a shoe. She reviewed the photographs of Ashton's head depicting multiple locations without hair growth, which are consistent with his having previously received injury significant enough that it scarred.

Ashton's growth was also a significant concern for Dr. Haney. Ashton had essentially stopped growing from age 2½ to age 6, which, according to Dr. Haney, medically indicates something is very wrong. She observed that testing was unable to find a genetic cause and noted the "catch-up growth" he experienced after he was placed in foster care. To Dr. Haney, this indicated that solely the environmental change between Carlos and Jennifer's house and his foster home was enough to get him to start growing.

Ultimately, Dr. Haney concluded that Ashton was the victim of multiple instances of physical abuse and had psychosocial dwarfism. She believes the consequences of these diagnoses will be permanent and lifelong. As a result, Ashton needs a stable environment with caregivers understanding of what he has been through, and he needs long-term, ongoing therapy with a therapist who understands trauma. Part of the stable environment that Ashton needs means attending school regularly and being "a normal child as much as possible." Dr. Haney expressed concern that if Ashton were returned to his previous environment, his condition would continue and he would be left even more severely disabled.

### (d) Parents' Denials

Throughout this case, Carlos and Jennifer continually denied ever abusing or neglecting Ashton. They insisted his injuries in 2005 were an accident caused by pulling him out of the bathtub, despite doctors' indications that such a high-force injury in such a young child could not have been an accident. Carlos and Jennifer also insisted that the injuries observed on Ashton in October 2011 were the result of a fall down the

stairs into their basement. However, forensic testing on a carpet sample from their stairs refuted their claim when it definitively excluded the carpet as the source of Ashton's injuries. They claimed that Ashton's numerous bumps, scrapes, and bruises were not caused by abuse, but, rather, that Ashton was easily injured, fell down more often than most children, and bruised easily.

Carlos and Jennifer denied making Ashton sleep in the basement, despite Skylar's and Ashton's claims to the contrary, and Carlos and Jennifer alleged that he slept on a mattress on the floor in Skylar's bedroom. Kihlthau observed a mattress standing up in the upstairs bathroom, but not until the third time she went to Carlos and Jennifer's house on October 12, 2011; Kihlthau testified that the mattress was not there when she was at the house earlier that day, and evidence established that Jennifer purchased a new toddler bed at 5 p.m. on October 12.

Carlos and Jennifer claimed that they had to limit Ashton's diet because of severe food allergies and because he suffered from a disorder where he could not recognize when he was full. However, after Ashton was placed in foster care, he was able to eat almost any food without having an allergic reaction to it, and a caseworker observed him walk away from food when he got full.

Carlos and Jennifer also claimed that Skylar had been coached to disclose the information that she did, but Townsend testified that Skylar's disclosures always remained consistent and that there was no evidence suggesting that she had been coached. In fact, when asked during her testimony if anyone had told her what to say, Skylar replied that Carlos and Jennifer told her not to tell the truth about what happened at their house.

Carlos and Jennifer admitted they lied to Ashton's school and to law enforcement when they said Ashton had an allergic reaction to a flu shot. Carlos acknowledged having kept Ashton home from school for fear of being suspected of child abuse due to Carlos' previous conviction in the 2005 case in Kansas and the incident where Ashton received staples for a laceration

on his head. They admitted they hid Ashton from DHHS for the same reason.

## 4. JUVENILE COURT'S ORDER

The juvenile court entered an order on October 11, 2012, terminating Carlos' and Jennifer's parental rights to Skylar, Ashton, Taylor, and Jordana. The court concluded that Carlos' and Jennifer's explanations of Ashton's facial injury were unbelievable and that they covered up his injuries without regard to his safety. The court noted that Ashton was in "terrible physical condition" when he was brought into the police station and that Carlos and Jennifer had no reasonable explanation for his condition. Accordingly, the court found that the State established by clear and convincing evidence that Ashton had been the victim of chronic abuse and neglect.

The court also determined that Carlos and Jennifer had failed to provide the necessary care and protection Ashton needs and deserves and that therefore, it is in the best interests of Ashton that their parental rights be terminated. The court noted that the significant abuse and maltreatment a child must experience before he or she is a victim of psychosocial dwarfism are substantial, continual, and repeated and that both Carlos and Jennifer actively contributed to the maltreatment that resulted in Ashton's suffering from a condition that has caused physical and mental wounds that may never heal. Based on the foregoing, the court found that Carlos' parental rights to Ashton should be terminated pursuant to Neb. Rev. Stat. § 43-292(2) and (9) (Cum. Supp. 2012) and that termination was in Ashton's best interests.

The court also concluded that Skylar, Taylor, and Jordana came within the meaning of § 43-292(2) and (9) due to the abuse and neglect of Ashton and that termination was in their best interests as well. Carlos timely appealed.

## III. ASSIGNMENTS OF ERROR

Carlos assigns, summarized, restated, and renumbered, that (1) the juvenile court never acquired jurisdiction over Jordana; (2) the court erred in finding that if the petitions to terminate parental rights were granted, the allegations under

§ 43-247(3)(a) would become moot; (3) the court erred in allowing physicians, a psychologist, mental health workers, and caseworkers to testify as experts as to psychosocial dwarfism without conducting a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/Schafersman*); (4) the court erred in accepting Dr. Buehler's diagnosis that Ashton suffered from psychosocial dwarfism; (5) the evidence did not sustain findings by clear and convincing evidence sufficient to terminate Carlos' parental rights under § 43-292; (6) the court erred in finding aggravating circumstances based on Dr. Haney's testimony; (7) the evidence did not sustain a finding that termination of Carlos' parental rights was in the children's best interests; and (8) the court erred in denying Carlos' request for an expert witness at the State's expense. Carlos also requests a review of the record for plain error.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id*.

## V. ANALYSIS

### 1. JURISDICTION OVER JORDANA

Carlos argues that the juvenile court never acquired jurisdiction over Jordana because a petition under § 43-247(3)(a) was not filed until nearly 3 months after the original motion to terminate Carlos' parental rights to Jordana was filed. This argument lacks merit because a juvenile court can acquire jurisdiction over a child via the filing of a motion to terminate parental rights.

[1-3] Neb. Rev. Stat. § 43-291 (Reissue 2008) states in part, "Facts may also be set forth in the original petition, a

supplemental petition, or motion filed with the court alleging that grounds exist for the termination of parental rights." Section 43-247(6) provides that the juvenile court shall have jurisdiction of "[t]he proceedings for termination of parental rights . . . ." In *In re Interest of Joshua M. et al.*, 256 Neb. 596, 608-09, 591 N.W.2d 557, 565 (1999), the Nebraska Supreme Court concluded that these two sections, taken together, "indicate that the juvenile court properly acquires jurisdiction over an original action to terminate parental rights as provided in the Nebraska Juvenile Code without prior juvenile court action, including adjudication."

[4] A motion to terminate parental rights is included in the relevant language of § 43-291. Thus, the juvenile court also acquires jurisdiction to terminate parental rights when a motion to terminate containing the grounds for termination is filed, without prior juvenile court action, including adjudication. In the instant case, the State filed a motion to terminate Carlos' parental rights to Jordana the day Jordana was born, prior to an adjudication.

[5,6] In *In re Interest of Joshua M. et al., supra*, the Supreme Court examined § 43-292(1) through (7) to determine upon what grounds a juvenile court may terminate parental rights without a prior adjudication. The court found that the grounds contained in § 43-292(1) through (5) do not "require, imply, or contemplate juvenile court involvement, including adjudication, prior to the filing of the petition for termination of parental rights." *In re Interest of Joshua M. et al.*, 256 Neb. at 609, 591 N.W.2d at 566. The court cautioned, however, that when a juvenile court proceeds with a hearing on a termination of parental rights without a prior adjudication, the proceedings must be accompanied by due process safeguards. *In re Interest of Joshua M. et al., supra*.

In this case, the State's motion to terminate Carlos' parental rights to Jordana was based upon § 43-292(2) and (9). We note that subsection (9) was not in effect at the time *In re Interest of Joshua M. et al.* was decided. Because we find that the State sufficiently proved subsection (2), as we explain in greater detail below, we need not address whether a prior adjudication was required under subsection (9). We must, however,

determine whether the requirements of due process were satisfied in the present case.

The first hearing held after the motion to terminate parental rights was filed was on December 20, 2011. Carlos and his counsel were present at the hearing. The court informed Carlos that the State had directly filed a motion to terminate parental rights and that the State had the burden of proving the allegations by clear and convincing evidence. The court advised Carlos of his rights, including the right to confront and question the State's witnesses; the right to present his own defense by calling witnesses, presenting his own testimony, and using the subpoena power of the court; and the right to appeal and obtain a record of the proceedings. Carlos indicated that he did not have any questions after the court explained his rights. The court asked Carlos if he wanted the motion to terminate read aloud in court, and Carlos responded, "No, I know what it says." This advisement occurred at the first court appearance on the State's motion to terminate. This was 8 months prior to the termination hearing, at which Carlos was represented by counsel, presented his own witnesses, and cross-examined the State's witnesses.

We have previously found that a similar rights advisement was sufficient to ensure that the parents were accorded their due process rights after the State filed a motion to terminate parental rights. See *In re Interest of Brook P. et al.*, 10 Neb. App. 577, 634 N.W.2d 290 (2001). Accordingly, we find that the content of the December 20, 2011, hearing was adequate to safeguard Carlos' due process rights. Therefore, the juvenile court had jurisdiction to terminate Carlos' parental rights to Jordana under § 43-292(2) without a prior adjudication via the motion to terminate parental rights filed on December 14.

### 2. Mootness of Allegations
### Under § 43-247(3)(a)

Carlos asserts that the juvenile court erred in finding that if it granted the petitions to terminate parental rights, the § 43-247(3)(a) allegations would become moot. He claims that the juvenile court lacked authority to extend its jurisdiction to the disposition phase without first proving the allegations in

the § 43-247(3)(a) petitions. We disagree because, as we determined above, a juvenile court may also obtain jurisdiction via the filing of a motion to terminate parental rights.

[7] Section 43-247 provides that "[t]he juvenile court shall have exclusive original jurisdiction as to . . . the parties and proceedings provided in subdivisions (5), (6), and (8) of this section." Subsection (6) includes the proceedings for termination of parental rights. A prior adjudication is not required in every instance where the State files a motion to terminate parental rights, and we determined that none was required in this case. See *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999).

A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Angelina G. et al.*, 20 Neb. App. 646, 830 N.W.2d 512 (2013). The practical application of terminating a parent's rights is that no services will be provided by DHHS in an attempt to reunify the parent and child. Thus, when a juvenile court grants a motion to terminate, there is no need to address any allegations under § 43-247(3)(a). Accordingly, it was not erroneous for the juvenile court to grant the petitions to terminate without a prior adjudication under § 43-247(3)(a) and determine that the § 43-247(3)(a) allegations were moot.

### 3. Allowing Expert Testimony

[8] Carlos assigns that the juvenile court erred in allowing several witnesses to testify as experts as to psychosocial dwarfism without conducting a *Daubert/Schafersman* hearing. We note that Carlos does not argue that he requested such a hearing, and our review of the record does not indicate that one was requested. The procedural posture of this case as described above creates somewhat of an anomaly because in adjudication cases, the Nebraska Rules of Evidence apply, but in termination cases, they do not. Compare *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012), with *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). The trial court in the instant case recognized this difference as indicated in its order:

Thus, under a Motion to Terminate Parental Rights the burden of proof is higher than an adjudication hearing. However, the [c]ourt does not have to apply the rules of evidence during a Motion to Terminate Parental Rights, but does have to apply the rules of evidence during an adjudication hearing.

The trial court's order indicates that it properly applied the differing evidentiary standards, stating: "During trial, the [c]ourt ruled on objections based on the rules of evidence, unless otherwise indicated. All evidence received, over objection, was considered by the [c]ourt for purposes of the [termination of parental rights] issues." Thus, it is presumed that the trial judge disregarded any evidence which should not have been admitted for purposes of adjudication, while giving proper consideration to it for purposes of termination. See *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

[9-11] In an adjudication hearing, an opponent of expert testimony is required to file a concise pretrial motion to challenge the expert's testimony on the basis of *Daubert*/*Schafersman*. See *In re Interest of Christopher T.*, 281 Neb. 1008, 801 N.W.2d 243 (2011). Carlos did not do so. And in a termination hearing, where the rules of evidence do not apply, neither do the *Daubert*/*Schafersman* standards. See *In re Interest of Rebecka P., supra*. Instead, due process controls and requires that fundamentally fair procedures be used by the State in an attempt to prove that a parent's rights to his or her child should be terminated. *Id*.

In *In re Interest of Rebecka P.*, the Nebraska Supreme Court determined that the father's due process rights were not violated by the testimony of a witness, because the father received notice of the termination hearing, he appeared at the hearing and was represented by counsel, and his counsel cross-examined the witness and raised several objections to the witness' testimony. The same is true in the present case. Carlos received notice of the termination hearing and the witnesses the State was going to question, he appeared at the hearing and was represented by counsel, and his counsel cross-examined

each witness and objected numerous times during the witnesses' testimonies. Carlos knew that the State was going to present evidence on psychosocial dwarfism, and he had the opportunity to prepare for the testimony prior to the termination hearing. We therefore find that due process requirements were satisfied and that the juvenile court did not err in allowing testimony regarding psychosocial dwarfism.

### 4. Dr. Buehler's Diagnosis

Carlos claims that "Dr. Buehler's certainty that Ashton suffered from psychosocial dwarfism is nothing more than post hoc, ergo propter hoc, a logical fallacy." Brief for appellant at 37. He complains that Dr. Buehler rendered a diagnosis of Ashton without investigating the home or using "basic diagnostic techniques to narrow down what in the environment was causing Ashton's medical problems." *Id*. at 35.

Carlos is essentially challenging the reliability of Dr. Buehler's diagnosis. Whether Dr. Buehler's testimony was credible was an issue for the juvenile court's determination, because Dr. Buehler's testimony regarding psychosocial dwarfism was properly admitted into evidence, as we concluded above. We note that even if Dr. Buehler's diagnosis was erroneous or unreliable, Drs. Guerue and Haney also diagnosed Ashton with psychosocial dwarfism. Thus, there was sufficient evidence beyond Dr. Buehler's testimony upon which the juvenile court could rely to find that Ashton did, in fact, suffer from psychosocial dwarfism. We therefore find this argument meritless.

### 5. Statutory Grounds
### for Termination

[12] Carlos argues that the evidence was not clear and convincing to terminate his parental rights under § 43-292. The bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al*., 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Carlos' parental rights, the juvenile court found that the State had proved § 43-292(2) and (9) by clear and convincing evidence. Under § 43-292(2), the court may terminate parental rights when the parent has "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection."

[13] Carlos argues that Ashton's disabilities were misdiagnosed as abuse. A finding of abuse or neglect may be supported where the record shows (1) that a parent had control over the child during the period when the abuse or neglect occurred and (2) that multiple injuries or other serious impairment of health have occurred which ordinarily would not occur in the absence of abuse or neglect. *In re Interest of Sarah C. & Jason C.*, 10 Neb. App. 184, 626 N.W.2d 637 (2001).

[14-17] The fact that only circumstantial evidence of abuse or neglect exists is not fatal to the State's allegations in this case, because circumstantial evidence may be used in a disposition proceeding in which the burden of proof is "clear and convincing." See *In re Interest of Ethan M.*, 15 Neb. App. 148, 723 N.W.2d 363 (2006). A fact proved by circumstantial evidence is nonetheless a proven fact. *Id*. Circumstantial evidence is not inherently less probative than direct evidence. *Id*. We have previously noted:

> In endorsing the use of circumstantial evidence to establish child neglect or child abuse, it has been stated that "[l]earned commentators have pointed out that in many such cases the only proof available is circumstantial evidence since abusive actions usually occur within the privacy of the home, the child is either intimidated or too young to testify, and the parents tend to protect each other."

*In re Interest of McCauley H.*, 3 Neb. App. 474, 480-81, 529 N.W.2d 77, 82 (1995).

In the present case, we conclude the State proved by clear and convincing evidence that Carlos substantially and continuously or repeatedly neglected and refused to give Ashton necessary parental care and protection. Although Carlos and Jennifer never admitted to abusing or neglecting Ashton, their

explanations for Ashton's injuries were disproved by medical evidence and the circumstantial evidence suggests they did so. Various medical personnel expressed concerns about physical abuse of Skylar in 2004 and of Ashton in 2005 and 2009 through 2011. Ashton's numerous bruises and scrapes caused concern in his teachers at school, so much so that they notified DHHS about his condition.

In addition, three doctors diagnosed Ashton with psychosocial dwarfism, which is a result of serious, sustained neglect to the extent that it caused Ashton to stop growing. This is not something that occurs overnight, but, rather, is a condition that occurs after repeated, long-term neglect. Medical evidence refuted Carlos' explanation for how Ashton sustained the mark on his face in October 2011 when it was found that a fall down carpeted stairs could not have caused his injuries. Even more concerning is that Carlos failed to seek medical treatment for Ashton's injuries in October 2011 and instead chose to hide him from police and DHHS in order to protect himself and Jennifer.

Not only did the circumstantial evidence suggest abuse and neglect, Skylar and Ashton disclosed that they had been abused and neglected. Skylar described the "spanking[s]" that she and Ashton received from Carlos and Jennifer using belts and shoes. She explained that while the rest of the family slept upstairs in beds, Carlos and Jennifer made Ashton sleep in a dog kennel in the basement, alone and in the dark. Ashton was not even allowed to eat at the same table as the rest of the family, and his diet was so severely limited that he tried to eat food that his classmates were throwing in the garbage.

The evidence presented at the termination hearing clearly and convincingly establishes that Ashton was the victim of repeated abuse and neglect. Accordingly, the court properly found that termination of Carlos' parental rights was appropriate under § 43-292(2). Because subsection (2) also allows for termination of parental rights based on continuous neglect of a juvenile's sibling, the court correctly determined that Carlos' parental rights to Skylar, Taylor, and Jordana should be terminated.

Although we find that the State also sufficiently proved grounds for termination under § 43-292(9), we decline to specifically address that subsection. See *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010) (if appellate court determines that lower court correctly found that termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground).

### 6. Aggravated Circumstances

Carlos asserts that the juvenile court erred in finding aggravated circumstances based on Dr. Haney's testimony. Because we find that termination under § 43-292(2) was proper, we need not address the evidence the juvenile court relied on to terminate Carlos' parental rights under § 43-292(9).

### 7. Best Interests

[18] Carlos argues that the court erred in finding that terminating his parental rights was in the best interests of the children. Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. See *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013). It is well established that a juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *Kenneth C. v. Lacie H., supra.*

[19,20] As we have noted, termination of parental rights requires proof of two elements: (1) that one or more statutory grounds for termination exist and (2) that termination would be in the best interests of the child. Statutory grounds are based on a parent's past conduct, but the best interests element focuses on the future well-being of the child. *Id.* While proof of the former will often bear on the latter, a court may not simply assume that the existence of a statutory ground for termination necessarily means that termination would be in the best interests of the child. *Id.* Rather, that element must be proved by clear and convincing evidence. *Id.*

The record in this case was replete with evidence as to why the children's future well-being would be best served by terminating Carlos' parental rights. Townsend and Drs. Buehler, Guerue, and Smith all testified about the dangers of placing the children back in the environment from which they were removed. Skylar and Ashton both expressed fear at the thought of being returned to Carlos' and Jennifer's care. Not only did Carlos and Jennifer make excuses for all of Ashton's injuries and never accept any responsibility for his condition, they actively concealed him and never sought medical treatment for injuries that caused concern in everyone else who observed them.

The improvements that Skylar and Ashton made in a brief period of time were remarkable to the caseworker and medical professionals. Thankfully, Taylor and Jordana were too young to be significantly impacted by their parents' actions. The above-described evidence overwhelmingly supports the juvenile court's conclusion that terminating Carlos' parental rights would be in the children's best interests.

## 8. Expert Witness at State's Expense

Carlos claims that the juvenile court erred in denying his request for an expert witness at the State's expense. He cites no Nebraska authority to support his argument, except the general propositions of law that parents have a fundamental liberty interest in the care and custody of their children. He claims that fundamental fairness to defend against termination of parental rights is so paramount that a parent is disadvantaged by the inability to retain expert assistance. He also notes that other states have enacted statutes or court rules requiring the state to pay for an expert witness for an indigent parent and urges us to "make that fundamentally fair procedure available to Nebraska parents." Brief for appellant at 34.

[21] We are unable to locate any Nebraska authority allowing a parent who hires private counsel to retain an expert witness at the State's expense. Nebraska law provides that a parent in a juvenile court case has the right to appointed counsel if unable to hire a lawyer. Neb. Rev. Stat. § 43-279.01(1)(b)

(Reissue 2008); *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992). And, in fact, the juvenile court appointed backup counsel for Carlos at the initial hearing because he had not yet formally retained an attorney for representation at that point. However, Carlos thereafter hired counsel at his own expense, which he maintained throughout the juvenile court proceedings. As a result, we cannot find that the juvenile court erred in refusing to require the State to pay for an expert witness on Carlos' behalf.

### 9. Plain Error

[22] Carlos requests that we review the record for plain error. It is not the duty of a reviewing court to search the record for the purpose of ascertaining whether there is error, and any error must be specifically pointed out. *In re Interest of N.L.B.*, 234 Neb. 280, 450 N.W.2d 676 (1990). However, we have conducted a de novo review of the record as required by our standard of review in juvenile cases and found no plain error.

### VI. CONCLUSION

We conclude that the juvenile court did not err in terminating Carlos' parental rights to Skylar, Ashton, Taylor, and Jordana. Therefore, the decision of the juvenile court is affirmed.

AFFIRMED.

─────────────

In re Interest of Nathaniel P., a child
under 18 years of age.
State of Nebraska, appellee, v.
Ashley P., appellant.
___ N.W.2d ___

Filed May 27, 2014.    No. A-13-620.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Jurisdiction: Appeal and Error.** A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law.