IN RE INTEREST OF SARAH C. AND JASON C.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
ERIC C. AND MIKALA C., APPELLANTS.
626 N.W.2d 637

Filed May 15, 2001.   Nos. A-00-709, A-00-710.

Michael J. Synek for appellants.

Shawn R. Eatherton, Deputy Buffalo County Attorney, and Vikki S. Stamm, guardian ad litem, for appellee.

HANNON, CARLSON, and MOORE, Judges.

CARLSON, Judge.

Eric C. and Mikala C. appeal from separate decisions of the county court for Buffalo County, sitting as a juvenile court, adjudicating their children, Sarah C. and Jason C., to be in a situation dangerous to life or limb, or injurious to their health or morals. For purposes of this appeal, we have consolidated these two actions. For the reasons set forth below, we affirm.

## BACKGROUND

On November 23, 1999, the juvenile court granted motions previously filed by the Buffalo County Attorney's office requesting orders allowing the State to take temporary custody of Sarah, born July 7, 1998, and Jason, born July 29, 1999. In these orders, the juvenile court placed temporary legal custody of the children with the Nebraska Department of Health and Human Services.

On November 24, 1999, the State filed separate petitions requesting that Sarah and Jason be adjudicated as children described in Neb. Rev. Stat. § 43-247 (Reissue 1998). The State alleged that Sarah and Jason were in a situation dangerous to their lives or limbs or injurious to their health or morals, given

that on August 3, doctors determined that Jason had a dislocated elbow and that on November 20, doctors determined that Jason had two fractured ribs. The State alleged that the children's parents offered only the explanation that possibly Sarah caused Jason's elbow injury and that the parents had no reasonable explanation regarding the injury to Jason's ribs.

On November 29, 1999, the juvenile court appointed two guardians ad litem to act as coguardians for the children.

On May 15, 2000, an adjudication hearing was held regarding both children. At trial, the State and the parents offered into evidence a stipulation containing facts which all of the parties agreed to. We repeat the relevant paragraphs of the stipulation.

Eric [C.], born January 9, 1979, and Mikala [C.], born September 18, 1981, married in August, 1999.

. . . On or about August 3, 1999, Mikala [C.] took Jason [C.] to the emergency room at Good Samaritan Hospital in Kearney, NE. Physical examination and x-rays of Jason [C.] by medical professionals indicated that Jason [C.] had a dislocated elbow and a small posterior chip fracture on the humerus bone in his arm.

. . . On or about November 16, 1999, Mikala [C.] took Jason [C.] to Kearney Clinic, P.C. with symptoms of severe coughing, wheezing, and a fever. Medical professionals at Kearney Clinic examined Jason [C.], diagnosed him as having pneumonia, and admitted him to Good Samaritan Hospital.

. . . Physical examinations and x-rays on or about November 17, 1999, of Jason [C.] by medical professionals at Good Samaritan Hospital indicated that Jason [C.] had two posterior fractures on his left ribs, number six and seven.

. . . On or about November 24, 1999, physical examination and full skeletal survy of Jason [C.] by medical professionals at Children's Hospital in Omaha, NE, which revealed a healing fracture in the right 2nd metacarpal.

. . . On or about December 20, 1999, a physical examination and full skeletal survey of Sarah [C.] was conducted by medical professionals at Children's Hospital in Omaha, NE, which revealed no fractures or abnormalities.

. . . Jason [C.] had a twin brother, Samuel, who died as a result of what was determined to be Sudden Infant Death Syndrome . . . .

. . . .

. . . The cause or causes of the injuries to Jason [C.] . . . are not known.

. . . On or about February 23, 2000, tests were conducted on Jason [C.] to determine if he had a "brittle bone"-type disease known as osteogenesis imperfecta. Said results indicate that Jason [C.] has no abnormality in his bone genetics.

The parties also stipulated that Sarah had suffered no broken bones or any other such injuries.

Mikala testified that on August 3, 1999, she noticed that Jason's right arm was hanging down at his side. Mikala testified that she took Jason to the emergency room that day and to the doctor the next day. Mikala testified that after taking Jason to the doctor, x rays showed that Jason had a dislocated and chipped right elbow. Mikala testified that she had no idea how Jason injured his elbow. Mikala testified that she was unemployed at that time and that Jason did not attend day care.

As to Jason's fractured ribs, Mikala testified that on November 16, 1999, she got a call from Jason's day-care provider, who told her that Jason was coughing and wheezing. Mikala testified that she then took Jason to the doctor who diagnosed Jason with pneumonia and two fractured ribs. Mikala testified that she did not know how those injuries occurred and that nothing made her suspicious that Jason had an injury to his ribs except that Jason acted sick. Mikala testified that even though Jason went to day care at that time, she and Eric were Jason's primary custodians.

Mikala testified that at the time of trial, she was about to get her high school diploma and was working part time. Mikala testified that she was involved in a program to develop her parenting skills, in addition to having completed first aid training and CPR training. Mikala testified that in the 2 months prior to the children's removal from their home, nine other people had watched or babysat the children. Mikala testified that she had no concerns about Jason's day-care providers.

Eric testified that on August 3, 1999, he also thought that Jason's right arm was limp, but that he had no explanation for Jason's injury to his elbow. Eric testified that on November 16, Jason was coughing, but that he observed no bruises or swelling on Jason indicating that Jason had an injury to his ribs. Eric testified that he did not know how this injury occurred. Eric testified that during the time period in question, he worked full-time days, but was home in the evenings helping to care for the children. Eric testified that he had taken some parenting classes with Mikala in addition to a CPR class. Eric testified that he had not taken any steps to ascertain how Jason's injuries occurred and that he was unsure whether Mikala had done so. Eric testified that he had no concern about anyone that had cared for the children prior to November 16.

The parents called two of their own witnesses at trial. The first witness, Kristine Beatson, testified that she had supervised several of the parents' visitations with their children from January through April 2000. Beatson testified that she observed Eric's and Mikala's parenting skills and testified that she did not observe anything inappropriate. She also testified that neither parent exhibited any violent tendencies toward the children and that neither child appeared to be fearful of their parents.

The parents also called Dan Hatfield, the pastor at their church. Hatfield testified that he had observed the parents with their children on several occasions, both at church and at home. Hatfield testified that both parents loved and cared for their children and that yet, there was a certain need for the development of their parenting skills. Even so, Hatfield testified that he had never seen either parent behave inappropriately with either child.

After trial, the trial court adjudicated both children as children described in § 43-247(3)(a) as a result of Jason's elbow injury and broken ribs. The court stated that both parents had neglected to provide proper or necessary care for their children's health and well-being. The court noted that Jason's injuries were unexplained, but stated that clearly the injuries occurred on multiple occasions when the parents were the primary care providers. The court added that although there was no abuse as to Sarah, the children had the same parents and were both of a young and vulnerable age. Subsequently, the parents filed

motions for new trial, which the trial court denied. The parents appeal.

## ASSIGNMENTS OF ERROR

The parents, restated, make the following arguments on appeal. Generally, the parents argue that the juvenile court erred in adjudicating both the children as minors under § 43-247(3)(a). Specifically, the parents contend that the court erred in (1) rendering a conclusion unsupported by the State's pleadings, (2) failing to dismiss the State's petitions for the State's failure to prove its case, and (3) denying their motions for a new trial.

## ANALYSIS

On appeal, the parents argue that the evidence was insufficient to establish jurisdiction over their children under § 43-247(3)(a). Specifically, the parents claim that the evidence did not establish who inflicted Jason's injuries and that Jason's injuries alone are insufficient upon which to adjudicate both Jason and Sarah. The State contends that the trial court correctly adjudicated the children under § 43-247(3)(a) given the evidence at trial showing that the children were in the primary care and control of their parents and that no reasonable explanation was advanced for the injuries Jason suffered. We agree with the State.

The relevant portion of § 43-247 applicable to this case provides as follows:

> The juvenile court in each county as herein provided shall have jurisdiction of:
>
> . . . .
>
> . . . Any juvenile (a) who is homeless or destitute, or without proper support through no fault of his or her parent, guardian, or custodian; who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; *whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile*; whose parent, guardian, or custodian is unable to provide or neglects

> or refuses to provide special care made necessary by the mental condition of the juvenile; *or who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile . . . .*

(Emphasis supplied.)

Initially, we address the parents' argument that the court erred in rendering a conclusion unsupported by the State's pleadings. In its petitions, the State alleged that Sarah and Jason were in a situation dangerous to their lives or limbs or injurious to their health or morals, while in its orders, the court found that the parents had neglected to provide proper or necessary care for their children's health and well-being. The parents argue that the juvenile court could not base its decision on a different portion of the statute than that pled by the State. Given that our review is de novo, we determine, independent of the findings of the trial court, whether the evidence supports the allegation pled by the State.

■ Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999).

The quantitative proof required for an adjudication based on § 43-247(3)(a) is a "preponderance of the evidence." See Neb. Rev. Stat. § 43-279.01(3) (Reissue 1998).

Regarding the sufficiency of the evidence to support the children's adjudication, we look to *In re Interest of McCauley H.*, 3 Neb. App. 474, 529 N.W.2d 77 (1995). In *In re Interest of McCauley H.*, a petition was filed alleging that McCauley was a juvenile in a situation dangerous to life or limb. The district court affirmed the decision of the county court that found the child to be a juvenile in a dangerous situation. The county court found by a preponderance of the evidence that the multiple bruises sustained by McCauley were consistent with a finding that the child had been subjected to physical abuse, although the evidence was inconclusive as to who inflicted the bruises.

The mother appealed, and this court held in part that the preponderance of the evidence showed that the bruises sustained by

McCauley were not normal or accidental, but intentionally inflicted. This court so held despite the mother's testimony at the adjudication hearing that she did not see the bruises. Alternatively, the mother claimed that McCauley may have received the multiple bruises from playing or falling, or from roughhousing with other little boys.

In part, this court based its conclusion that McCauley's injuries were intentionally inflicted on the testimony of a pediatrician, who examined the child and concluded that McCauley had been intentionally injured on multiple occasions. This pediatrician testified that the bruises over McCauley's entire body were recent, within the last 5 to 14 days, and that the bruises were not accidentally acquired because of their bilateral placement, because of their location, and because children 18 months old do not usually fall backward.

In *In re Interest of McCauley H.*, this court adopted the following proposition: A finding of abuse or neglect may be supported where the record shows (1) that a parent had control over the child during the period when the abuse or neglect occurred and (2) that multiple injuries or other serious impairment of health have occurred which ordinarily would not occur in the absence of abuse or neglect.

There is no question in the instant case that Eric and Mikala were the children's primary caregivers. Additionally, although the children attended day care and were watched by other individuals in the months prior to the children's removal from their parents' home, neither parent had any suspicions about the care given by any of these individuals.

In regard to the second requirement, we recognize that there is no expert testimony in the instant case, as there was in *In re Interest of McCauley H.* Even though evidence of that nature would be preferable, we conclude, based on this record, that it is unnecessary in the instant case. The evidence shows that Jason sustained numerous broken bones during the first few months of his life. The record shows that Jason did not suffer these injuries as a result of "brittle-bone" disease or some other type of childhood abnormality. The parents offered no explanation as to Jason's injuries and had no suspicions about Jason's day-care providers or the other individuals who cared for the children in

the months prior to Jason's injuries. The above facts dictate the conclusion that Jason's multiple injuries would not have ordinarily occurred in the absence of abuse or neglect. Furthermore, we hold as we have in the past that it is unnecessary for the State to prove the identity of the individual who inflicted Jason's injuries. As we stated in *In re Interest of McCauley H.*, 3 Neb. App. 474, 480-81, 529 N.W.2d 77, 82 (1995):

> In endorsing the use of circumstantial evidence to establish child neglect or child abuse, it has been stated that "[l]earned commentators have pointed out that in many such cases the only proof available is circumstantial evidence since abusive actions usually occur within the privacy of the home, the child is either intimidated or too young to testify, and the parents tend to protect each other."

Additionally, we look to the Nebraska Juvenile Code itself and the purpose behind it.

Neb. Rev. Stat. § 43-246 (Reissue 1998) states in relevant part:

> Acknowledging the responsibility of the juvenile court to act to preserve the public peace and security, the Nebraska Juvenile Code shall be construed to effectuate the following:
>
> (1) To assure the rights of all juveniles to care and protection and a safe and stable living environment and to development of their capacities for a healthy personality, physical well-being, and useful citizenship and to protect the public interest.

The juvenile code must be liberally construed to accomplish its purpose of serving the best interests of the juveniles who fall within it. *In re Interest of Crystal T. et al.*, 7 Neb. App. 921, 586 N.W.2d 479 (1998). Additionally, we have stated that the right of a parent to the custody and control of his or her child is a natural right protected by the Constitution, but such right is subject to the paramount interest which the public has in the protection of children from abuse and neglect. *In re Interest of Eric O. & Shane O.*, 9 Neb. App. 676, 617 N.W.2d 824 (2000). The best interests of the children is the hallmark of the juvenile code. *Id.*

The parents appear to argue in their brief that even if there was sufficient evidence upon which to adjudicate Jason, that

does not give the court jurisdiction over Sarah. Specifically, the parents point out that there is no evidence in the record showing that Sarah has ever sustained any injuries. In support of their claim, the parents cite *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992). In *In re Interest of N.M. and J.M.*, the Supreme Court held that a juvenile court lacked jurisdiction over a minor child alleged to lack parental care by reason of the fault or habits of the parents. In that case, there were no factual allegations, no evidence at the adjudication hearing, and no findings concerning the actions of either the father or mother as to their minor daughter. There were allegations regarding injuries received by the parents' minor son. Although we are aware of the court's holding in that case, we conclude that the juvenile court properly adjudicated both Sarah and Jason under § 43-247(3)(a). In the instant case, we do have specific allegations and findings as to both juveniles. We reach our conclusion based upon a liberal construction of the juvenile code and the facts of the case now before us.

## CONCLUSION

After a de novo review of the record, we conclude that the State proved by a preponderance of the evidence that both Sarah and Jason were in a situation dangerous to life or limb, or injurious to their health or morals. We conclude that the juvenile court did not err in adjudicating Sarah and Jason as minors under § 43-247(3)(a), nor did the juvenile court err in overruling the parents' motion for new trial. The juvenile court's decision is affirmed.

AFFIRMED.

HANNON, J., dissents.