IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF SEBASTIAN D. & LILLIAN-JO D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SEBASTIAN D. AND LILLIAN-JO D.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CORWYN D., APPELLANT.

Filed April 26, 2016.    No. A-15-772.

Appeal from the Separate Juvenile Court of Lancaster County: LINDA S. PORTER, Judge. Affirmed.

Sanford J. Pollack, of Pollack & Ball, L.L.C., for appellant.

Joe Kelly, Lancaster County Attorney, and Ashley J. Bohnet for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

MOORE, Chief Judge.

### INTRODUCTION

The separate juvenile court of Lancaster County adjudicated Sebastian D. and Lillian-Jo D. as children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014), but it found that the State of Nebraska did not prove by clear and convincing evidence sufficient grounds to terminate the parental rights of Corwyn D. to Sebastian and Lillian-Jo or that termination of Corwyn's parental rights was in the children's best interests. Corwyn appeals the adjudication portion of the court's order. For the reasons set forth herein, we affirm the judgment of the juvenile court.

BACKGROUND

Corwyn and Jessica D. were married in August 2012. They are the parents of Lillian-Jo, born in February 2013, and Sebastian, born in April 2014. On September 24, when Sebastian was hospitalized with the injuries at issue in this case, Corwyn, Jessica, and the children were living together in the house where Jessica's parents also resided. On September 26, Sebastian and Lillian-Jo were placed in the temporary custody of the Nebraska Department of Health and Human Services (the Department) by the juvenile court. The children have been in an out-of-home relative foster care placement with Jessica's brother and sister-in-law since that time.

On September 26, 2014, the State filed a petition in the juvenile court, alleging that the children lacked proper parental care by reason of the fault or habits of Corwyn and/or were in a situation dangerous to life or limb or injurious to their health or morals. Specifically, the State alleged that on or about September 24, one of the children was found to have bodily injuries that were non-accidental and/or did not occur during the child's natural movements. The State alleged that Corwyn was the children's primary caregiver and that his actions placed the children at risk of physical and/or emotional harm. A review of the motion for ex parte temporary custody and supporting affidavit filed by the State shows that Sebastian suffered subdural hematomas and retinal hemorrhages consistent with non-accidental injury. In the petition, and subsequent amended petitions, the State also alleged that the children lacked proper parental care by reason of the fault or habits of Jessica. We do not discuss those allegations further, however, because the court ultimately dismissed that count of the operative petition for failure of proof and because Jessica is not involved in the present appeal. Also on September 26, the juvenile court entered an ex parte order placing Sebastian and Lillian-Jo in the Department's temporary custody.

On October 7, 2014, following a hearing on the motion for temporary custody, the juvenile court ordered that the children remain in the Department's custody and in their relative foster care placement. The court also ordered supervised visitation between both parents and the children as arranged by the Department. The temporary custody hearing was continued several times and the interim orders remained in effect until a hearing on December 11 when the court accepted the parties' stipulation that the children's temporary legal and physical custody should remain with the Department. In its order of December 19, the court found that reasonable efforts were being made to prevent the children's continued removal from the parental home in the form of supervised parenting time, relative placement, transportation assistance, and the offer of psychological evaluations and parenting assessments on a voluntary basis to both parents. The court found that the return of legal custody to the parents would be contrary to the children's health, safety, and welfare due to allegations that Sebastian was found to have injuries that in the opinion of his doctor were consistent with child abuse. The court again ordered supervised parenting time for both parents.

On February 23, 2015, the State filed an amended petition and motion for termination of Corwyn's parental rights. The State amended the allegations under § 43-247(3)(a) to state that Corwyn caused Sebastian's injuries and specified that the injuries included retinal hemorrhaging and subdural hematomas. The State alleged grounds for terminating Corwyn's parental rights under Neb. Rev. Stat. § 43-292(2), (8), and (9) (Cum. Supp. 2014) and alleged that termination of

his parental rights was in the children's best interests. The changes in a second amended petition and motion for termination of Corwyn's parental rights filed on April 2 related only to the § 43-247(3)(a) allegations concerning Jessica.

On March 31, 2015, the juvenile court ordered supervised visitation for both parents with the children a minimum of three times per week for a minimum of two hours per visit as arranged by the Department. On April 8, the court entered Corwyn's denial to the allegations of the second amended petition and motion for termination of parental rights. The court ordered Jessica to have monitored visitation with the children as arranged by the Department, including possible overnights with advance notice to all parties and hearing on any objection. Corwyn was to have no contact with Jessica or the children during Jessica's parenting time, and Jessica was to immediately report any such contact to the Department caseworker and the visitation worker. The court ordered Corwyn's visitation to remain supervised at a minimum of three times per week, two hours per visit, as arranged by the Department. On July 10, the court entered an order approving monitored overnight visitation by Jessica with the children. The court specified that Corwyn should not be present during the monitored parenting time.

A consolidated trial on the adjudication and termination of parental rights was held on April 9-10, 16-17, 22-23, and May 14-15, 2015. The court heard testimony from witnesses including Corwyn; Jessica; Jessica's parents, grandmother, brother, and sister-in-law; the police officer who investigated the allegations of child abuse; the family support workers who supervised visitation for the family; the Department caseworker assigned to the case; and Sebastian's treating doctors, as well as additional medical experts. The court received exhibits into evidence, including police interviews with Jessica and Corwyn, visitation notes, and numerous medical records. The record on appeal includes over 1,200 pages of testimony and five volumes of exhibits. Accordingly, although we have considered all of the evidence adduced at the adjudication hearing in our de novo review, we set forth only a limited recitation of that evidence in the interest of brevity.

From the time of Sebastian's birth in April 2014 until his hospitalization on September 24, the children lived in the family home together with their parents and maternal grandparents, who were the only care providers for the children during this period. Jessica and her parents all worked outside the home during various daytime hours, leaving Corwyn, who was not employed outside the home during this period, as the sole care provider from approximately 7-9 a.m. until 2:30-3 p.m. Tuesday through Friday.

There was evidence concerning two "episodes" experienced by Sebastian while under Corwyn's sole care. The first episode occurred on August 13, 2014. According to Corwyn, Sebastian arched his back, cried out in an unusual way, and became listless or limp for somewhere between 30 seconds and two minutes. Corwyn indicated he was changing the children's diapers immediately prior to the episode and stated that Sebastian "gets pissed" when Corwyn is the one changing his diaper. Corwyn called 911 after being unable to reach Jessica, and Sebastian was taken to the hospital by ambulance. Sebastian recovered somewhat between the time Corwyn called 911 and the ambulance arrived. He was examined at the hospital by emergency room physician, Dr. Christopher Christensen, who found nothing noteworthy in his examination. Christensen found Sebastian to be "fussy," but otherwise, a normal, healthy baby, and his only recommendation was to follow-up with Sebastian's pediatrician.

Between the first and second episodes, the family changed their schedules to limit the times when Corwyn would be left alone to care for both children, however, he was the sole care provider on a couple of occasions, one of which was September 7, 2014 when the second episode occurred. Corwyn reported that on this occasion, Sebastian again arched his back, cried unusually, and became limp and unresponsive for 10-15 minutes. The evidence is unclear as to whether the second episode occurred during or after a diaper change. While Sebastian was unresponsive, Corwyn tried to revive him and eventually called Jessica's father. When Jessica's father returned home, he and Corwyn took Sebastian to the emergency room where he was examined by Dr. Jose Gutierrez. Sebastian was presenting normally by that point. Gutierrez found nothing noteworthy other than that Sebastian was fussy, crying, and had upper respiratory issues. His lab work was also normal. Sebastian was held overnight in the hospital and examined the following day by a neurologist, Dr. George Wolcott.

Wolcott found nothing neurologically atypical in his examination of Sebastian, which included an ophthalmological assessment. Wolcott did not see any retinal hemorrhages or any external evidence of trauma or abuse. Wolcott recommended a change in Sebastian's feeding and diaper changing position to a 45-degree angle in case the episodes were related to reflux issues. Wolcott also recommended follow-up at the next scheduled appointment with Sebastian's pediatrician, Dr. Julie Steinhauser.

On September 15, 2014, Steinhauser saw Sebastian for his 4-month well-child checkup. She had seen him on four previous occasions, including a visit shortly after the first episode. On September 15, Steinhauser found that the circumference of Sebastian's head had changed dramatically between his 3-month and his 4-month checkups, from the 50th percentile for infants of his age to greater than the 99th percentile. Due to this atypical change and the two seizure-like episodes, Steinhauser recommended an MRI to identify any cranial abnormalities.

The MRI, completed on September 24, 2014, revealed "[c]omplex bilateral subdural collections with evidence of blood products of different ages, and findings concerning for bilateral retinal hemorrhages raising strong concern for nonaccidental trauma." Sebastian was then admitted to the hospital, and further extensive testing and neurological and ophthalmological examination and consultation ensued. A skeletal survey was normal, and an EEG did not suggest any significant seizure potential.

Dr. Donny Suh, a pediatric ophthalmologist, examined Sebastian and found "extensive" preretinal and retinal hemorrhages in both eyes consistent with nonaccidental trauma. Because the bleeding was in multiple levels of Sebastian's eyes, Suh was able to rule out conditions that cause more localized bleeding. He ruled out Terson Syndrome, which typically occurs in adults or elderly patients with ruptured blood vessels in their brains.

Neurology consultations were provided by Drs. Linden Fornoff and Bradley Bowdino, with Dr. Rhonda Wright providing a pediatric neurology consult. Fornoff and Bowdino's assessment found "enlarged extraaxial spaces with differing chronicity of bilateral SDH, no hemorrhage, no hydrocephalus." Bowdino diagnosed Sebastian with "[c]urrent subdural hematomas, subacute subdural hematoma, benign extra axial fluid of infancy." He testified that children with benign extra axial fluid of infancy were slightly more likely to have subdural hematomas, but he did not believe that this condition caused Sebastian's subdural hematomas. He

opined that the subdural hematomas and retinal hemorrhages sustained by Sebastian were "non-accidental trauma related." Wright found "[c]omplex bilateral subdural collections with evidence of blood products of different ages, and findings concerning for bilateral retinal hemorrhages raising strong concern for nonaccidental trauma." She noted that "[o]ther conditions such as infection/meningitis or coagulopathies can uncommonly mimic this appearance. Therefore, a thorough evaluation for other entities should also be performed."

Dr. Suzanne Haney, a pediatrician specializing in child abuse, reviewed Sebastian's medical records, including the MRI and skeletal survey. She also conducted a physical examination, which revealed that Sebastian's fontanelle was full, indicating that there could be increased pressure. Based on the additional testing performed, Haney ruled out the other possibilities suggested by Wright of infection, bleeding disorder, arteriovenous malformation, leaving only the possibility of accidental or inflicted trauma. Haney observed that "the theory" was that children with "enlarged extra axial spaces" could bleed from something less than abusive head trauma, but she testified that when they do, "it's a different pattern of injury . . . a different pattern of bleeding than what we see with Sebastian." She testified further that "the vast majority of children who have large heads, normal brains, extra space are fine and never bleed." Haney did not believe Sebastian had Terson Syndrome based on his age and the lack of a significant subarachnoid bleed. There was nothing in Sebastian's history to indicate accidental trauma, and Haney diagnosed him with abusive head trauma. She testified that "[w]e only see" external injuries in about half of the cases of abusive head trauma and that it is possible to cause significant trauma to a child's head and neck without leaving marks or causing bruises.

Haney, Suh, and Bowdino all testified that the force required to cause Sebastian's injuries could not be precisely quantified, but that it was not insignificant or minor and not something a child would encounter in the course of its normal movements. Examples of an infant being shaken or thrown against a soft surface such as a bed or mattress were provided to explain how a child could have internal injuries such as Sebastian's without signs of external injury. There was no evidence in the record of Sebastian suffering any accidental trauma. However, Corwyn did express a concern upon being questioned by Jessica's father at the time of Sebastian's hospitalization that, given Sebastian's medical condition, he may have "put Sebastian down too hard on the couch." Since his placement in foster care, Sebastian has experienced no further episodes like those of August 13 and September 7, 2014, and the injuries to his brain and eyes appear to be resolving. Sebastian continues to suffer from macrocephaly, having a larger head than expected for his age, which is likely due to hereditary factors.

Corwyn presented expert testimony from Dr. Joseph Scheller, a pediatric neurologist, and Dr. Matthew Wood, an ophthalmologist.

Scheller relied on Sebastian's condition of "benign extra axial fluid of infancy" in forming his opinion. He testified that this condition could lead to subdural hematomas from just "a minor impact." He opined that Sebastian's injuries were attributable to "small acute subdural hemorrhages" which can "occur spontaneously or may also develop from mild head trauma" that would not trigger complications in infants without the condition but "would be enough to stress small blood vessels on the surface of the brain under pressure from an extra layer of fluid." Scheller felt that Sebastian's retinal hemorrhages were "not severe" and were "not specific for abusive head

- 5 -

injury," but "can occur with conditions that cause increased pressure in the head as Sebastian had." Scheller also relied on the absence of external evidence of physical abuse such as bruising, fractures, or neck or spinal cord injuries. Scheller concluded, "Sebastian was not a victim of child abuse. He had a chronic condition that made him more prone to develop a small subdural hemorrhage without moderate or severe head injury."

Wood disputed Suh's classification of Sebastian's retinal hemorrhages as "severe" due to the involvement of multiple layers of the retina because "the severity of retinal hemorrhages is not standardized." He stated that retinal hemorrhages such as Sebastian's are not specific for abusive head injury but could also be caused by "any source of intracranial hemorrhage such as a ruptured cerebral aneurysm" or by Terson Syndrome.

On July 16, 2015, the juvenile court entered an order adjudicating Sebastian and Lillian-Jo as juveniles within the meaning of § 43-247(3)(a) upon finding by a preponderance of the evidence that Corwyn caused the injuries to Sebastian. However, as noted above, the court found the evidence presented with respect to Jessica insufficient and dismissed the count of the petition containing allegations with respect to her. Finally, the court found the State had failed to prove the alleged grounds for terminating Corwyn's parental rights by clear and convincing evidence and found that termination of his parental rights was not in the children's best interests. The court conducted a very thorough review of the extensive and complex medical evidence in this case, resulting in a detailed 24-page opinion. We discuss specific findings of the court with respect to the adjudication in the analysis section below.

ASSIGNMENTS OF ERROR

Corwyn asserts that the juvenile court erred in (1) giving undue weight to the State's expert witnesses based on their physical examination of Sebastian and (2) adjudicating Sebastian and Lillian-Jo as children within the meaning of § 43-247(3)(a).

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Enyce J.*, 291 Neb. 965, 870 N.W.2d 413 (2015). When credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of Joseph S.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

ANALYSIS

*Weight Given to State's Experts.*

Corwyn asserts that the juvenile court erred in giving undue weight to the State's expert witnesses based on their physical examination of Sebastian. In the adjudication order, the court stated:

Drs. Scheller's and Wood's opinions do not dissuade this Court from crediting the informed opinions of the other physicians in this case, specifically Drs. Haney, Suh, and Bowdino, who actually examined and treated Sebastian and who were also aware of Sebastian's condition of benign extra-axial spaces of infancy, but did not believe this

condition provided a nonabusive explanation for Sebastian's subdural hematomas and retinal hemorrhages.

We do not read the above statement as an indication that the juvenile court placed undue weight on the fact that the State's medical experts examined Sebastian while Corwyn's did not. When the court's opinion is read as a whole, it is clear that the court was focused on the explanations provided for the cause of Sebastian's subdural hematomas and retinal hemorrhages and that it accepted the explanations provided by the State's experts over those provided by Corwyn's. Clearly, all of the experts relied on the results of the MRI, skeletal scan, and other testing in reaching their opinions as to the cause of Sebastian's trauma. This was not a case where the test results themselves were in conflict, but rather the interpretations of those results by the various medical experts were conflicting. In our de novo review, we consider and give weight to the fact that the juvenile court observed the medical experts when they testified at trial and accepted the opinions of Haney, Suh, and Bowdino that Sebastian's subdural hematomas and retinal hemorrhages were caused by nonaccidental trauma rather than the benign condition from which he suffered. See *In re Interest of Joseph S., supra*. This assignment of error is without merit.

*Adjudication*.

Corwyn asserts that the juvenile court erred in adjudicating Sebastian and Lillian-Jo as children within the meaning of § 43-247(3)(a).

At the adjudication stage, in order for a juvenile court to assume jurisdiction of a minor child under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence, and the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsections of § 43-247. *In re Interest of Trenton W.*, 22 Neb. App. 976, 865 N.W.2d 804 (2015). In this case, the State alleged that the children lacked proper parental care in that Sebastian was found to have non-accidental injuries caused by Corwyn, that Corwyn was the children's biological father and a caregiver for them, and that his actions and/or the described situation placed them at risk for harm.

The juvenile court relied upon the considerable circumstantial evidence to find that Corwyn caused Sebastian's injuries. A finding of abuse or neglect may be supported where the record shows (1) that a parent had control over the child during the period when the abuse or neglect occurred and (2) that multiple injuries or other serious impairment of health have occurred which ordinarily would not occur in the absence of abuse or neglect. *In re Interest of Jordana H.*, 22 Neb. App. 19, 846 N.W.2d 686 (2014). The Nebraska Supreme Court has held that uncontradicted evidence establishing that a child sustained injuries of a nature not likely to occur in the normal course of the child's movements and which would have some physical manifestations associated with them, together with the parent's failure to promptly seek medical treatment for the injuries, is sufficient to support a finding that the child is a neglected child within the Nebraska Juvenile Code. *In re Interest of A.L.G.*, 230 Neb. 732, 432 N.W.2d 852 (1988). Further, it is not necessary for the State to prove the identity of the individual who inflicted injuries upon the child. See *In re Interest of Sarah C.*, 10 Neb. App. 184, 626 N.W.2d 637 (2001).

With respect to Sebastian, the evidence shows that when he was hospitalized on September 24, 2014, he had extensive subdural hematomas and retinal hemorrhages of differing chronicities. The medical experts relied upon by the juvenile court attributed these injuries to non-accidental or abusive head trauma. Prior to his hospitalization, Sebastian experienced "episodes" on two occasions while solely in Corwyn's care. No one else witnessed these episodes, and Sebastian has had no further episodes since being placed in foster care. Haney found the described episodes of unresponsiveness during diaper changes "concerning for inciting events." Corwyn acknowledged that he may have "put Sebastian down too hard." The juvenile court found it noteworthy that neither Scheller nor Wood "really offered any persuasive explanation as to how such significant episodes experienced by Sebastian could be explained or caused by his condition of benign extra-axial spaces of infancy without some type of notable trauma."

We recognize that there was contradicted medical evidence regarding the source of Sebastian's injuries and Corwyn did seek medical care for Sebastian following both episodes, although there was a slight delay in doing so following the second episode. We conclude, nevertheless, that giving weight to the fact that the trial court heard and observed the witnesses, the record shows, by a preponderance of the evidence, that Sebastian lacked proper parental care and was subjected to physical abuse while in Corwyn's custody. The juvenile court did not err in adjudicating Sebastian as a child within the meaning of § 43-247(3)(a).

We also conclude that the juvenile court did not err in adjudicating Lillian-Jo. Although Lillian-Jo did not suffer injuries, she was in the same home and under the control of Corwyn, who regularly cared for the children alone. While the record shows that Corwyn had a very positive relationship with his daughter, it also shows that both of Jessica's parents, who lived in the same residence, had some concern about Corwyn's parenting skills and attentiveness to household responsibilities. And, we have found that Sebastian was subjected to physical abuse while in Corwyn's care, which certainly places Lillian-Jo at risk for harm. A court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child. *In re Jamie M.*, 14 Neb. App. 763, 714 N.W.2d 780 (2006). See, *In re Interest of Sarah C., supra* (finding adjudication of both children appropriate where child's sibling suffered unexplained injuries while in the parents' control and custody). The juvenile court did not err in adjudicating Lillian-Jo as a child within the meaning of § 43-247(3)(a).

CONCLUSION

The juvenile court did not err in adjudicating by adjudicating Sebastian and Lillian-Jo as children within the meaning of § 43-247(3)(a).

AFFIRMED.